# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 4347 | **DATE** | 3/30/2001 |
| **CASE TITLE** | Andrew Spencer vs. Michael F. Sheahan, et al. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 4/17/2001 at 10:00 A.M.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order: Defendant's Motion for Summary Judgment [43-1] is denied. Defendant's Motion to Strike Plaintiff's Response to Defendant's Statement of Uncontested Material Facts [60-1] is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

MAR 3 0 2001

date docketed

docketing deputy initials

date mailed notice

Document Number

65

courtroom deputy's initials

Date/time received in central Clerk's Office

mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANDREW SPENCER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 97 C 4347 |
| | ) | |
| MICHAEL F. SHEAHAN, et al. | ) | Magistrate Judge Nolan |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Andrew Spencer, a former pretrial detainee at the Cook County Jail, brought this civil rights action pursuant to 42 U.S.C. Section 1983 alleging deliberate indifference to a serious medical need. Ghassan Zalzaleh, M.D., the only remaining defendant, moves for summary judgment.[1] The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Dr. Zalzaleh's summary judgment motion is denied.

### I. FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 Statements and exhibits and are undisputed for purposes of ruling on summary judgment unless indicated otherwise.[2] Spencer

---

[1] Spencer's counsel states that all Defendants other than Dr. Zalzaleh have been dismissed as result of a motion by Spencer's counsel. On May 25, 2000, the Court granted Spencer's motion to dismiss Jacleode Benn, Ruby Willis, Rose McBride, and Sarah Godbolt as defendants. The docket does not reflect the dismissal of Julie Anitunji from the case. Based on Spencer's counsel's representations, the Court hereby dismisses Julie Anitunji as a defendant in this case.

[2] Defendant has moved to strike Spencer's Response to Defendant's Statement of Uncontested Facts. Spencer's Response fails to comply with Local Rule 56.1 in several respects. Rather than punish Spencer for his attorney's errors, the Court has scoured the medical records and relevant depositions and independently determined the undisputed facts.

was arrested on July 29, 1996 for burglary. Spencer's dep., pp. 4, 8. At that time, Spencer suffered from numerous health problems, including, but not limited to, hypertension, possible coronary artery disease, asthma, and insulin-dependent diabetes, which once resulted in ketoacidosis. Spencer's Local Rule 56.1(b)(3)(A) statement ¶¶ 2, 87. On August 1, 1996, Spencer was admitted to Cermak Health Services of Cook County ("Cermak"), Division 8 Residential Unit (RU).[3] Spencer had not had any insulin since July 28, 1996 and was not prescribed insulin until the morning of August 5, 1996. Defendant's Exh.G, vol. I, pp. 2, 154.

On September 9, 1996, Spencer injured his foot when he hit it on a steel bed while attempting to exit his living quarters in accordance with the orders of correctional officers. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 3. According to Spencer, the injury to his right foot began as a cut between the fourth and fifth toes. Id. ¶ 4. Spencer testified that he noticed his foot was bleeding during a strip search that occurred after he exited his living quarters. Spencer's dep., p. 33. Spencer informed an officer that his foot was bleeding when he returned to the unit. Id. The officer told a nurse that Spencer's foot was bleeding. Id., pp. 33-34. Rose McBride, a licensed practical nurse (LPN), examined Spencer's foot within a half an hour. Id., p. 39. She cleansed the wound with saline, put ointment on it, and covered it with gauze to prevent infection. Spencer's Local Rule 56.1(b)(3)(A) ¶¶ 5, 77, 78. McBride instructed Spencer to follow-up with the physician at his next diabetic clinic appointment. Id. ¶ 79. Spencer testified that Julie Adetunji, a nurse, arranged for him to see Dr. Zalzaleh before his scheduled appointment after hearing his complaints about his foot.

---

[3] Cermak's diabetes care policy provides in part: "Because insulin requiring diabetics need daily attention and careful supervision in a correctional setting, males are to be housed in Division 8 Residential Unit (RU), where frequent changes in medication and close monitoring of blood sugars are possible." Defendant's Exh. H.

Id. ¶ 83.

On September 10, 1996, the day following Spencer's injury, Dr. Zalzaleh examined Spencer. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 6. The nurse noted that Spencer complained of a headache for one week. Id. There is no documentation of any complaints by Spencer regarding his right foot. Id. Dr. Zalzaleh's notes indicate that Spencer was not compliant with his diabetes medication. Defendant's Exh. G, vol. I, p. 21. However, between August 6, 1996 and September 10, 1996, Spencer had refused insulin on only one occasion. Defendant's Exh. G, vol. II, p. 120.

On September 23, 1996, Dr. Zalzaleh ordered Elavil 25 mg for every hour of sleep for 10 days. Defendant's Exh. G, vol, I, p. 96; vol. II, p. 11. No physician notes in the record indicate why Dr. Zalzaleh ordered Elavil for Spencer. Dr. Zalzaleh explained at his deposition that Spencer was likely seen at a walk-in appointment complaining of not being able to sleep because Elavil is generally prescribed as a sleeping medication. Zalzaleh dep., p. 34.

Gail Leinen, a registered nurse (RN), examined Spencer on October 7, 1996. Her notes indicate that Spencer complained of edema (swelling), slight redness, and pain to his right foot. Leinen dep., pp. 21-23; Defendant's Exh. G, vol. I, p. 22. Leinen testified that a temperature, redness, warmth to touch, swelling, and tenderness could be possible signs of infection. Id., pp. 22-23; 46-47. Spencer's temperature was 97.0 during his October 7 examination. Id., p. 22.

On October 7, 1996, Dr. Zalzaleh also examined Spencer. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 7. He found no edema, redness, or physical wound on Spencer's right foot. Id.; Zalzaleh's dep., pp. 36-38. Dr. Zalzaleh could not recall whether he looked in between Spencer's toes. Zalzaleh's dep., p. 37. Dr. Zalzaleh noted that Spencer's diabetes was controlled. Defendant's Exh. G, vol. I, p. 22. Dr. Zalzaleh continued the same medication and sent Spencer for

a hemoglobin A1C which is a test to determine if his diabetes was controlled during the last three months. Zalzaleh dep., p. 36. Dr. Zalzaleh also prescribed nitroglycerin as needed for his coronary artery disease. Id. With respect to Dr. Zalzaleh's complaints of pain, Dr. Zalzaleh testified: "I didn't find him to be in pain, actually. He was a drug seeker, so he was complaining of anything, but I didn't find any pain; I didn't find any physical thing on him." Id., p. 39. Spencer testified that he had been drug free since 1993 or 1994. Spencer's dep., p. 23. Dr. Zalzaleh claims that he referred Spencer to a neurologist on October 7, but the medical records doe not support Dr. Zalzaleh's assertion.

On October 21, 1996, Dr. Mansour wrote a prescription for Tylenol #3 twice daily for 1 week and ordered a neurology consult because Spencer was complaining of numbness and pain in both feet. Defendant's Exh. G, vol. I, pp. 52, 97. On October 24, 1996, the neurology department appears to have ordered heat packs twice daily for 2 days and anti-fungal ointment after dressing changes for one month. Id., p. 141; Zalzaleh's dep., p.44.

On October 27, 1996, Mattie Moss, a LPN, examined Spencer and noted that he complained that the sole of his right foot was sore. Defendant's Exh. G, vol. I, p. 23; Zalzaleh's dep., p. 40. The nurse noted: slight discoloration at this time, states pain for 2 weeks, order was given for heat packs on 10/24/96 for three days, no previous order noted, insulin-dependent diabetes mellitus, please re-evaluate in sick call area on 10/28/96. Id. Moss stated that she gave her progress note regarding Spencer's condition to Dr. Zalzaleh by either placing it in his box or handing it to him. Moss dep., p. 42. Moss explained that it was important to note discoloration in the foot of a diabetic because diabetics have poor circulation in extremities. Id., pp. 41-42. Moss testified that discoloration is an

"early warning sign" and if not treated, could worsen and cause necrosis.[4] Id., pp. 42-43. Dr.

Zalzaleh wrote on the October 27, 1996 progress note, "eye ball in 2 days." Defendant's Exh. G, vol.

I, p. 23; Zalzaleh's dep., p. 40. On October 29, 1996, Dr. Zalzaleh examined Spencer's foot and sent

him to the foot clinic as a priority patient. Defendant's Exh. G, vol. I, p. 55. Dr. Zalzaleh noted on

the consultation request form that positive skin changes existed and Spencer complained of right foot

pain. Id.

Also on October 29, 1996, a neurologist prescribed Elavil 25 mg for every hour of sleep in

response to Spencer's complaints of blisters and pain at the bottoms of his feet especially when

ambulating. Defendant's Exh. G, vol. I, p. 52; Zalzaleh's dep., p.43. The neurologist's impression

was hyperplasia,[5] polyneuropathy,[6] diabetic foot ulcers, and rule out foot injury. Id; Zalzaleh's dep,

p. 46. The neurologist recommended laboratory work including a complete blood count.

Defendant's Exh. G, vol. I, p. 52. The neurologist also referred Spencer for an urgent podiatry

consultation because he had bilateral foot ulcers. Id., p. 53.

On November 5, 1996, Spencer was seen for a foot consultation. Defendant's Exh. G, vol.

I, p. 54; Zalzaleh's dep., p. 47. Spencer complained of a painful right fifth toe . Id. Dr. Oh's

physical examination revealed an interdigital callus and a red sore on the right fifth toe. Id. Dr. Oh's

impression was diabetic foot injury. Id. He prescribed antibiotics and daily Betadine soaks of the

---

[4] Necrosis is defined as "[t]he pathologic death of one or more cells, or of a portion of tissue or organ, resulting from irreversible damage." Stedman's Medical Dictionary 929 (5th ed. 1982).

[5] Hyperplasia is "an increase in the number of cells in a tissue or organ, excluding tumor formation, whereby the bulk of the part or organ is increased." Stedman's Medical Dictionary 675 (5th ed. 1982).

[6] Polyneuropathy is "a disease involving a numbers of peripheral nerves." Stedman's Medical Dictionary 1119 (5th ed. 1982).

right foot for 20 minutes. Defendant's Exh. G, vol. I, pp. 54, 100; Zalzaleh dep., p. 47. Dr. Oh also ordered an x-ray of Spencer's right foot. Defendant's Exh. G., vol. I, p. 54; Zalzaleh's dep., p. 47.

On November 12, 1996, Spencer was again examined at the foot clinic. Defendant's Exh. G, vol. I, p. 55. The physician noted a right foot ulcer, open and sore, between toes 4 and 5 for two weeks. Id. An x-ray was negative for osteomyelitis.[7] Id. The physician ordered antibiotics and Betadine soaks to continue. Id. Spencer also saw a neurologist on November 12, 1996. Defendant's Exh. G, vol. I, p. 56; Zalzaleh's dep., p. 54. The neurologist diagnosed Spencer with a diabetic foot infection and increased the amount of his Elavil prescription. Id; Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 13.

On November 15, 1996, a physician's assistant and Dr. Frahm examined Spencer. Defendant's Exh. G, vol, I, p. 24; Zalzaleh's dep, pp. 55-56. The progress notes indicate a right foot ulcer healing slowly. Id. An x-ray of the right foot was negative for osteomyelitis. Id. The physician ordered antibiotics and Betadine soaks to continue. Id. Spencer was given an appointment to return in one week.

On November 22, 1996, Dr. Zalzaleh examined Spencer. Defendant's Exh. G, vol. I, p. 25; Zalzaleh's dep., pp. 57-58. A nurse noted that Spencer complained of swelling in his right foot. Defendant's Exh. G, vol. I, p. 25. Dr. Zalzaleh noticed no edema on Spencer's extremities. Id. Dr. Zalzaleh noted the existence of an ulcer with blackened skin on Spencer's small right toe. Id. Dr. Zalzaleh ordered Spencer to continue with his present medications. Id. Dr. Zalzaleh referred Spencer to the foot clinic as a priority patient. Defendant's Exh. G, vol. I, p. 58.

---

[7] Osteomyelitis is defined as an "inflammation of the bone marrow and adjacent bone." Stedman's Medical Dictionary 1004 (5th ed. 1982).

On November 24, 1996, Moss examined Spencer's foot and referred him for a podiatry consultation as a priority patient because of discoloration on the right, fifth toe which was not responding to Betadine soaks. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 16. The next day, Spencer was seen in the foot clinic. Id. ¶ 17. Gangrenous changes to the right fifth toe were noted. Spencer was referred to orthopedics for possible Cook County Hospital ("CCH") admission. Id. Spencer refused admission to CCH on November 25, 1996. Id. ¶ 18. At his deposition, Spencer explained why he initially refused to be admitted to the hospital: "He was trying to send me out to the county hospital then, but it kind of hurted me in a way and I couldn't believe it, that I had to have my toes cut off from this little scratch. So I was like, is you sure that this is – do I got to have my toes cut off?" Spencer's dep., p. 65.

On November 27, 1997, Spencer agreed to be admitted to the CCH. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 19. On November 29, 1997, Spencer's right third and fifth toes were amputated. Defendant's Exh. L, p. 10. The surgical pathology report states: "45-year-old African American complaining of painful right foot for 2-3 weeks which has worsened." Id. The pathology diagnosis was: "skin and subcutaneous tissue with necrotic inflammatory and arteriolosclerotic changes." Id. On December 3, 1996, CCH released Spencer. Id. ¶ 21. A physician at the jail examined Spencer on the same day he was discharged from the hospital. Defendant's Exh. G, vol. I, pp. 8, 26, 61.

Spencer testified that he was scheduled for an appointment in the foot clinic on December 10, 1996, but the jail did not keep the appointment. Spencer's dep., p. 75; see also Defendant's Exh. G, vol. I, p. 61. On December 11, 1996, an orthopedist examined Spencer and noted that the wound site was improving. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 23. Spencer was seen in the

foot clinic on December 17, 1996 to have the remaining sutures removed and the wound re-dressed. Id. ¶ 24. Two days later, Dr. Zalzaleh examined Spencer and referred him for an urgent, orthopedic consultation because the surgical wound was open. Id. ¶ 25.

On December 23, 1996, Dr. Zalzaleh again examined Spencer and noted an open surgical wound status post amputation. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 26. Dr. Zalzaleh noticed no discharge but believed the wound was still not healing properly. Id. He prescribed pain medication and promptly transferred Spencer to the foot clinic. Id. That same day, a podiatrist examined Spencer's right foot. Defendant's Exh. G, vol. I, p. 64; Zalzaleh's dep., p. 67. The podiatrist noted: "mild swelling, wound without gross purulence, some fibrinous exudate [], no cellulitic[8] changes." Defendant's Exh. G. vol, I, p. 64. The podiatrist changed Spencer's antibiotic and prescribed wet-to-dry dressings three times daily. Id; Zalzaleh's dep., p. 67. The podiatrist directed Spencer to return in one week. Id.

On December 26, 1996, a nurse examined Spencer's foot and noted that Spencer was seen at the orthopedic clinic on December 23, 1996 and the clinic recommended partial foot amputation. Defendant's Exh. G, vol. I, p. 49. The nurse further noted: "side of foot now split open, foot looks much worse." Id. Dr. Ali then examined Spencer in the Cermak emergency room. Defendant's Exh. G, vol. I, p. 9. Dr. Ali's diagnosis was gangrene of the right foot. Id. He sent Spencer to CCH's emergency room. Id. The emergency room physician noted: right foot pain since toe amputation 1 month ago, when pain is severe patient develops midsternal chest pain, patient has second component of pain which is chronic constant for two weeks, patient changing dressing daily

---

[8] Cellulitic is defined as "inflammation of cellular or connective tissue." Stedman's Medical Dictionary 249 (5th ed. 1982).

on foot. Defendant's Exh. L, p. 26. The physician's examination revealed a 7 cm open incision healing secondarily on lateral aspect of foot, good granulation tissue, no edema or signs of cellulitis. Id. A complete blood count and x-ray of the right foot was done. Id. The physician noted that he had discussed Spencer's situation with "podiatry who will evaluate patient tomorrow am." Defendant's Exh. L, p. 27. The physician prescribed Tylenol #3. Id. Spencer was scheduled for a 7 am appointment with Dr. Harvey but was apparently never seen by Dr. Harvey. Id.

On December 27, 1996, Dr. Zalzaleh examined Spencer in the Cermak emergency room after he was discharged from CCH. Defendant's Exh. G, vol. I, p. 10. Dr. Zalzaleh noted a positive surgical wound over Spencer's right foot, surgical wound open, no discharge, positive skin dark. Id. Dr. Zalzaleh recommended that Spencer be seen by the podiatry department and continue Tylenol # 3. Id. On December 28, 1996, a nurse noted that Spencer was complaining of excruciating pain. Defendant's Exh. G, vol. I, p. 28. She observed an open area on Spencer's right foot. Id. The nurse notified the emergency room physician of Spencer's complaints and her observations. Id. The emergency room physician directed Spencer to see Dr. Zalzaleh on December 30, 1996 and the nurse prescribed pain medication. Id.

On December 28, 1996, an orthopedist examined Spencer's foot. Defendant's Exh. G., vol. I, p. 65; Zalzaleh dep., pp. 73-74. The orthopedist found the wound enlarged, no purulent drainage, 3rd and 4th toes dry gangrene, and no erythema (redness). Id. The orthopedist recommended amputation of at least the 3rd and 4th toes and a possible mid-foot amputation. Defendant's Exh. G, vol. I, p. 65. Spencer was referred to the CCH foot clinic. Id. On December 31, 1996, a physician at the CCH foot clinic examined Spencer's foot. Defendant's Exh. L, p. 4. The physician found gangrene spreading to Spencer's second and third toes. Id.; Zalzaleh's dep., p. 77. The physician

ordered that the vascular department be consulted and Spencer return in two weeks. Defendant's Exh. L, p. 4. The physician ordered Tylenol #3. Defendant's Exh. G, vol. I, p. 111. On December 31, 1996, Spencer refused debridement.[9] Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 73.

On January 6, 1997, Dr. Zalzaleh examined Spencer. Defendant's Exh. G., vol. I, pp. 29, 66. Dr. Zalzaleh noted that Spencer's wound was closed. Defendant's Exh. G, vol. I, p. 66. Dr. Zalzaleh further noted that Spencer had an appointment with an orthopedist on January 21, 1997 but needed to be seen earlier. Id. Dr. Zalzaleh immediately sent Spencer to the Cermak foot clinic to be evaluate for possible hospital admission. Id. That same day, an unidentified physician at the Cermak foot clinic examined Spencer's right foot and noted gangrene with wound dehiscense[10] and failure with intractable pain. Id. The physician ordered Spencer admitted to orthopedics at CCH. Id.

On January 15, 1996, Spencer was admitted to CCH and his right forefoot was amputated. Defendant's Exh. L, pp. 21-22. The operative report states in part:

> Patient complains of severe pain and open lesion that will not heal. Patient desires surgical intervention at this time. Physical examination reveals palpable pulses on the right foot. Neurologically intact to the right. Integument exam revealed an open lesion on the lateral side of the forefoot approximately 5 x 2 cm with a granular base, but a fibrotic rim. Patient complains of severe pain around third and fourth digits with the appearance of black discoloration, possible gangrenous changes to these digits. There is a foul order coming from the patient's foot, but not purulent discharge. X-rays reveal a partial fifth ray resection on the right foot.

Id.

---

[9] Debridement is defined as an "excision of devitalized tissue and foreign matter from a wound." Stedman's Medical Dictionary 364 (5th ed. 1982).

[10] Dehiscense is a "bursting open, splitting, or gaping along natural or sutured lines." Stedman's Medical Dictionary 371 (5th ed. 1982).

On January 23, 1997, Spencer returned to Cermak and Dr. Zalzaleh examined his foot. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 35. Dr. Zalzaleh reported that Spencer's wound had been examined by the surgeon that morning. Id. Dr. Zalzaleh gave Spencer a follow-up appointment. Id. On February 3, 1997, Spencer was examined by Dr. Mansour. Id. ¶ 36. Dr. Mansour noted that there were no signs of infection and the sutures were in place. Id. He prescribed medications and sent Spencer to physical therapy for gait training. Id.

On March 4, 1997, Spencer was seen by Dr. Zalzaleh and a physician's assistant. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 37. Spencer refused a blood count exam and was referred to ophthalmology and for physical therapy. Id. Dr. Zalzaleh noted that the surgical wound was healing. Id. On March 13, 1997, a physical therapist instructed Spencer on posture and positioning. Id. ¶ 38. On March 25, 1997, Dr. Zalzaleh examined Spencer's foot. Defendant's Exh. G, vol. I, p. 35. Dr. Zalzaleh noted small blisters over the heal without any signs of infection. Id. Spencer told the nurse that his foot was chronically cold. Id. Dr. Zalzaleh prescribed a vasodilator to increase blood flow. Zalzaleh's dep., p. 82.

On April 8, 1997, Spencer was examined by an unidentified physician. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 40. The physician noted that Spencer's wound was healing nicely and there was no drainage and no signs of infection or cellulitis. Id. The physician reported that Spencer was "doing well" and recommend that Spencer keep his foot padded when ambulating. Id. The physician prescribed additional medications. Id. On April 16, 1997, Dr. Zalzaleh examined Spencer and noted that the surgery site was clean and a positive pulse existed in the foot. Id. ¶ 41. Dr. Zalzaleh noted that he would check into a prosthetic device for Spencer to use when ambulating. Id. ¶ 41.

On April 22, 1997, Dr. Zalzaleh examined Spencer's right foot and noted a callous on the soles of his foot. Defendant's Exh. G, vol. I, p. 72; Zalzaleh's dep., p. 84. Spencer was referred to a podiatrist. Id. On April 25, 1997, an x-ray of Spencer's right foot was performed in accordance with Dr. Zalzaleh's orders. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 43. The x-ray revealed possible edematous changes and the possibility of early cellulitis could not be ruled out. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 43.

On April 28, 1997, an orthopedist examined Spencer. Defendant's Exh. G, vol. I, p. 73. The orthopedist noted no cellulitis, no drainage, no warmth, and no evidence of infection. Id. He further noted a small plantar blister. Id. Spencer was directed to return to the clinic in twelve weeks. Id. On March 4, 1997, Spencer refused a diabetic diet and a chemical blood workup. Spencer's Local Rule 56.1(b)(3)(A) statement ¶¶ 69, 74. On May 4, 1997, Dr. Mansour examined Spencer in the Cermak emergency room. Defendant's Exh. G, vol. I, p. 12. Spencer complained of pain, swelling, and drainage. Id. Dr. Mansour noted minimal drainage and tenderness at the amputation line. Id. Dr. Mansour prescribed antibiotics and wet-to-dry dressing changes. Id. On May 5, 1997, Dr. Zalzaleh examined Spencer's right foot and referred Spencer to the Cermak foot clinic in urgent need. Defendant's Exh. G, vol. I, p. 74. Dr. Zalzaleh's referral stated: "I think patient is known to your service, complains daily of foot pain where he had the amputation, also complaining of blisters, and color changes in skin. Please see patient, and assure him." Id.

On May 6, 1997, Dr. Zalzaleh examined Spencer in the emergency room at Cermak. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 47. Dr. Zalzaleh referred Spencer to the Cermak foot clinic and ordered an evaluation by a vascular specialist. Id. As a result of these examinations, Spencer was admitted to CCH. Id. On May 7, 1997, Spencer underwent debridement at CCH. Id.

¶ 48.  On May 20, 1997, Spencer refused to go to a foot clinic appointment.  Id. ¶ 51.  On May 8, 1997, Spencer saw a physical therapist.  Zalzaleh's dep., p. 91.

On May 16, 1997, Dr. Zalzaleh examined Spencer's foot.  Defendant's Exh. G, vol. I, p. 35; Zalzaleh's dep., pp. 91-92.  A nurse noted that Spencer complained of a burning sensation in his foot.  Defendant's Exh. G, vol. I, p. 36.  Dr. Zalzaleh found no sign of infection.  Id.  Dr. Zalzaleh prescribed pain medication and indicated that Spencer should be seen at the CCH foot clinic.  Id. The consultation portion of the referral form usually completed by the foot clinic is not completed. Id.  On May 20, 1997, Spencer refused to go to the foot clinic at CCH.  Spencer's Local Rule 56.1(b)(3)(a) Statement ¶¶ 51, 75.

On May 27, 1997, a vascular specialist examined Spencer's right foot and noted a pulse over an artery in the back of the foot or the top of the foot.  Defendant's Exh. G, vol. II, p. 109; Zalzaleh's dep., p. 92.  The vascular specialist further noted that Spencer's wound was clean and almost healed. Defendant's Exh. G. vol. II, p. 109.  On June 26, 1997, Spencer complained of bleeding over the right stump.  Defendant's Exh. G, vol. I, p. 37; Zalzaleh's dep., p. 93.  A physician examined Spencer and noted a small ulcer with occasional bleeding.  Defendant's Exh. G, vol. I, p. 37.  The physician prescribed antibiotics and Betadine soaks.  Id.  Spencer was directed to return in three weeks.  Id.

On June 6, 1997, Dr. Rosenberg examined Spencer at the CCH foot clinic and diagnosed an infected right stump.  Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 53.  Spencer underwent a debridement of the wound and received prescriptions for medications and antibiotics.  Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 53.

On July 1, 1997, Dr. Zalzaleh examined's foot Spencer. Defendant's Exh. G, vol. I, p. 78. Dr. Zalzaleh noted an ulcer on Spencer's foot and urgently referred Spencer to the Cermak foot clinic. Id. That same day, Spencer was examined at the foot clinic and diagnosed with an ulcer on the right foot. Id. The physician prescribed local wound care with antibiotic ointment and oral antibiotics. Id. On July 7, 1997, a physician at the Cermak foot clinic examined Spencer and diagnosed a recurrent infection and wound failure. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 57. The physician consulted with an orthopedist concerning possible hospitalization. Id. Two days later, an orthopedist examined Spencer at CCH and prescribed intravenous antibiotics. Id. ¶ 58.

On July 13, 1997, Spencer was again admitted to CCH. Defendant's Exh. L, p. 15. Spencer complained of a partial infected right foot for two weeks prior. Id. On July 16, 1997, Spencer underwent surgery for stump revision. Id. A few days after the surgery, Spencer reported that his condition had improved and that his foot was no longer painful. Id. On July 28, 1997, Spencer was discharged to the jail. Id. Spencer was instructed to keep the dressing clean, dry, and intact. Id., p. 16. Spencer was further instructed to see Dr. Pulla at the foot clinic on August 1, 1997 and Dr. Dumlao at the medicine clinic on August 15, 1997. Id.

On July 28, 1997, Dr. Romaine examined Spencer at Cermak. Defendant's Exh. G, vol. I, pp. 17, 81. Dr. Romaine recommenced that Spencer return to the foot clinic on August 1, 1997. Id. Dr. Zalzaleh completed a consultation request form on July 29, 1997 referring Spencer to the CCH foot clinic on August 1, 1997. Defendant's Exh. G, vol. I, p. 82.

On August 1, 1997, Spencer was seen at the CCH foot clinic. Defendant's Exh. G, vol. II, p. 111. The physician prescribed Tylenol 650 mg and Motrin 800 mg. Defendant's Exh. G, vol. II,

p. 106. On August 5, 1997, Spencer was seen at the Cermak foot clinic. Defendant's Exh. G, vol. I, p. 83. The physician noted that Spencer's stump was healing well. Id. The physician removed some of the sutures. Id. The physician instructed Spencer to return in one week. Id. On August 11, 1997, Spencer was seen at the Cermak foot clinic and had the remainder of his sutures removed. Defendant's Exh. G, vol. I, p. 84.

On August 18, 1997, an orthopedist examined Spencer and noted that his wound had healed and his foot was intact. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 64. On September 16, 1997, Dr. Zalzaleh examined Spencer and found that Spencer's wound had stabilized. Id. ¶ 66. Dr. Zalzaleh referred Spencer to American Limb to be fitted for special walking shoes. Id.

On August 27, 1997, a physician's assistant and Dr. Mansour examined Spencer. Defendant's Exh. G, vol. I, p. 40. Spencer reported that Elavil relieved shooting pain in his feet. Id. Dr. Mansour noted the appearance of 2-3 blisters in the medial aspect of Spencer's foot that had been there for one week, right stump healed, no drainage, no surrounding erythema, no edema, and Spencer's feet were warm. Id. Dr. Mansour recommended that Spencer be seen at the vascular clinic and the amputation clinic. Id. Dr. Mansour also noted that Spencer was experiencing hypoglycemia episodes 3 to 4 times a week and was refusing chemical strip tests which report blood sugar level. Id. Dr. Mansour continued Spencer's medications to prevent further complications. Id.

On September 15, 1997, Spencer was seen in the Cermak emergency room afer he slammed his right foot in a door. Defendant's Exh. G, vol. I, p. 18. The physician noted mild swelling and tenderness and diagnosed a contusion of the right foot. Id. The physician prescribed Tylenol #3, warm packs, and an x-ray. Id. A day later, Spencer was given an antibiotic. Zalzaleh's dep., p. 96.

On August 30, September 1, and September 15, 1997, Spencer refused medications. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 71. Spencer's refusals of treatment made monitoring his diabetes and his foot injury more difficult for medical personnel and decreased the likelihood of successful treatment. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 76. During the course of Spencer's treatment, he refused at least 93 Accu-Checks which would have enabled medical personnel to properly regulate his insulin. Id. ¶ 68. Spencer refused insulin on three occasions over the fourteen months of treatment. Spencer's Id. ¶ 70

Diabetics are at risk for foot complications. Zalzaleh dep., p. 26. Dr. Zalzaleh testified that wound care in diabetics is especially important because wounds in diabetics take a long time to heal. Id., p. 11. According to Dr. Zalzaleh, wounds in diabetics must be treated aggressively. Id. Dr. Zalzaleh testified that a diabetic with a cut on his foot should be treated with antibiotics, if necessary, or provided topical treatment, such as cleaning and dressing. Id., p. 22. To get antibiotics or topical treatment, an inmate would need to be seen by a doctor or physician's assistant. Id., pp. 22-23. Dr. Zalzaleh testified that throughout Spencer's treatment for his foot condition, Dr. Zalzaleh and the other medical specialists used conservative measures to treat Spencer. Spencer's Local Rule 56.1(b)(3)(A) statement ¶ 67. Amputations were not performed until it was absolutely medically necessary. Id.

## II. DISCUSSION

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial

when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." <u>Id.</u> at 256.

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from deliberate indifference to a serious medical need. <u>Chapman v. Keltner</u>, 2000 WL 167999, *2 (7th Cir. 2001). To meet the deliberate indifference to serious medical need standard, a pretrial detainee must satisfy a two-part test. <u>Gutierrez v. Peters</u>, 111 F.3d 1364, 1369 (7th Cir. 1997). A plaintiff must first establish an objectively serious medical need. <u>Id.</u> The second prong of the test requires that the prison official acted or failed to act with a sufficiently culpable state of mind. <u>Id.</u> With this framework in mind, the Court addresses Dr. Zalzaleh's summary judgment motion.

An objectively serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Gutierrez</u>, 111 F.3d at 1373 (citation and internal quotation omitted). However, failure of a prison medical staff to "dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue–the sorts of ailments for which many people who are not in prison do not seek medical attention–does not . . . violate the Constitution." <u>Cooper v. Casey</u>, 97 F.3d 914, 196 (7th Cir. 1996).

Spencer has at least raised a genuine issue of material fact as to whether he suffered from a serious medical condition. Spencer, a known diabetic, suffered from a cut between two toes on his right foot and a subsequent infection which resulted in two amputations and a stump revision surgery

-17-

during his 14 month stay at Cook County Jail. Spencer's condition required treatment from nurses, a physician's assistant, and numerous physicians and specialists who repeatedly prescribed painkillers, Betadine soaks, antibiotics, x-rays, and eventually two amputations and a revision surgery. Spencer's repeated complaints of pain are documented in the medical records. Dr. Zalzaleh does not appear to dispute that Spencer suffered from a serious medical condition. See Defendant's Memorandum of Law, p. 5 (conceding that Spencer's foot wound was deemed sufficiently serious to require prompt medical intervention).

The Court next considers whether Dr. Zalzaleh displayed deliberate indifference to Spencer's medical needs. The subjective element of the deliberate indifference standard requires that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw that inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). Refusal to treat chronic pain, delay in providing medical treatment, refusal to provide prescribed pain medication, or erroneous treatment based on a substantial departure from accepted medical judgment may evidence deliberate indifference. Jones v. Simek, 193 F.3d 485, 490 (7th Cir.1999); Langston v. Peters, 100 F.3d 1235, 1240 (7th Cir. 1996); Ralston v. McGovern, 167 F.3d 1160, 1162 (7th Cir. 1999); Sherrod v. Lingle, 223 F.3d 605, 611 (7th Cir. 2000). Neither medical malpractice nor reasonable medical judgment that leads to a bad result amounts to deliberate indifference. Sherrod, 223 F.3d at 611.

Viewing the evidence in the light most favorable to Spencer, he raises a genuine issue of material fact regarding whether Dr. Zalzaleh acted with deliberate indifference to his condition. It is undisputed that a team of nurses and physicians repeatedly treated Spencer's foot injury and

subsequent infection by prescribing antibiotics, Betadine soaks, painkillers, x-rays, and eventual amputations during the course of his fourteen months in confinement. Spencer seeks only to hold Dr. Zalzaleh responsible for depriving him of prompt medical care with respect to the foot care he received in October, 1996 and does not object to the treatment provided by other medical personnel.

Spencer focuses solely on Dr. Zalzaleh's conduct in October of 1996. Dr. Zalzaleh saw Spencer on two occasions (October 7 and October 29) during the month of October, 1996. Dr. Zalzaleh claims that when he learned of Spencer's complaint of pain to his right foot, swelling, and slight redness (on October 7), he examined Spencer's right foot and found no swelling, no redness, and no physical wound. Dr. Zalzaleh conceded, however, that he could not recall whether he looked between the toes on Spencer's right foot which is where Spencer alleges the cut occurred. Dr. Zalzaleh disregarded Spencer's complaints of pain and failed to prescribe painkillers because he did not see a physical wound and he believed Spencer to be a drug seeker who would complain of anything.

Twenty days later (on October 27), Dr. Zalzaleh learned from a nurse's notes that the sole of Spencer's right foot was now slightly discolored and Spencer complained of suffering pain for two weeks. Discoloration is an "early warning sign" and if not treated, could worsen and cause necrosis. Upon learning of Spencer's discolored foot and complaints of pain, Dr. Zalzaleh did not examine Spencer or order treatment or a referral. Rather, Dr. Zalzaleh decided to "eye ball" Spencer's condition in two days. Two days later (on October 29), Dr. Zalzaleh examined Spencer's right foot, observed "positive skin changes," and referred Spencer to the foot clinic as a priority patient. Dr. Zalzaleh testified that by "positive skin changes" he meant "some redness or some change in the skin." Zalzaleh dep., p. 42. "Positive skin changes" are "not a good thing." Id. The

same day Dr. Zalzaleh observed "positive skin changes," a neurologist diagnosed Spencer with diabetic foot ulcers. Defendant's Exh. G, vol. I, pp. 52-53. Dr. Zalzaleh admitted that foot ulcers and foot wounds "may be the same" and should be treated with Betadine soaks and dressing and to prevent an infection, "you throw some antibiotic on it." Dr. Zalzaleh's dep., pp. 52, 53. Dr. Zalzaleh did not prescribe Betadine soaks and dressing or antibiotics on October 29. It was not until November 5, 1996 that Dr. Oh in the Cermak foot clinic examined Spencer's foot, diagnosed a diabetic foot injury, ordered an x-ray, and prescribed antibiotics and daily Betadine soaks.

Given these circumstances, a reasonable trier of fact could conclude that the delay Spencer experienced in receiving medical treatment for his foot as a result of Dr. Zalzaleh's inaction amounts to deliberate indifference. Dr. Zalzaleh's testimony establishes the detrimental effect delay can have when treating a foot injury in a diabetic. Dr. Zalzaleh testified that wound care in diabetics is especially important and wounds must be treated aggressively because wounds in diabetics take a long time to heal. Dr. Zalzaleh explained that a diabetic with a cut, wound, or ulcer on his foot should be treated with antibiotics, if necessary, or provided topical treatment, such as cleaning and dressing.

Despite his knowledge that diabetics are at risk for foot problems and require prompt wound care to prevent long term complications, Dr. Zalzaleh did not immediately examine Spencer's right foot upon learning that the sole of Spencer's right foot was slightly discolored and that Spencer complained of pain for two weeks. Dr. Zalzaleh waited two days to "eye ball" Spencer's foot. When Dr. Zalzaleh observed "positive skin changes" two days later, he failed to prescribe any treatment. Dr. Zalzaleh did refer Spencer to the Cermak foot clinic for diagnosis and treatment but failed to ensure that Spencer was promptly seen by a specialist. On the referral form, Dr. Zalzaleh circled

"priority" rather than "urgent" regarding when the consultation should be scheduled. Spencer waited seven more days before being diagnosed by a physician in the foot clinic and receiving treatment. The severity of Spencer's condition on October 29 and the importance of prompt attention and treatment is confirmed by the neurologist's finding the same day that Spencer suffered from diabetic foot ulcers and his urgent referral of Spencer to the podiatry clinic to rule out "foot insult."

A reasonably jury could find that a seven-day delay between the time when Dr. Zalzaleh observed "positive skin changes" on Spencer's right foot and the time Spencer was diagnosed and treated by the foot clinic indicates disregard of a serious risk to Spencer's health given the fact that foot injuries in diabetics need prompt and aggressive medical attention to prevent long term complications. Accordingly, Dr. Zalzaleh's motion for summary judgment will not be granted.

## III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is DENIED. Defendant's Motion to Strike Plaintiff's Response to Defendant's Statement of Uncontested Material Facts is GRANTED IN PART and DENIED IN PART. The parties shall appear for a status hearing on April 17, 2001 at 10 am.

ENTER:

*Nan R. Nolan*

Nan R. Nolan
United States Magistrate Judge

Dated: MAR 3 0 2001

-21-